1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

MARIE LIMANTOUR, on behalf of herself
and all others similarly situated,

Plaintiff,

v.

CRAY INCORPORATED, JAMES E.
ROTTSOLK, PETER J. UNGARO, DAVID
R. KIEFER, SCOTT J. POTERACKI, and
KENNETH W. JOHNSON,

Defendants.

No.  C05-943Z

ORDER

16

17

18

19

20

21

22

This matter comes before the Court on a motion to dismiss by Defendants Cray

Incorporated ("Cray"), James E. Rottsolk ("Rottsolk"), Peter J. Ungaro ("Ungaro"), David R.

Kiefer ("Kiefer"), Scott J. Poteracki ("Poteracki"), and Kenneth W. Johnson ("Johnson").

Docket no. 51.  Having reviewed the motion to dismiss, Plaintiffs' opposition brief, docket

no. 53, the reply brief thereto, docket no. 57, and all supporting declarations and exhibits, and

having heard the argument of counsel on March 28, 2006, the Court enters the following

Order.

23

## BACKGROUND

24

25

26

In their Consolidated Amended Class Action Complaint (the "Complaint"), docket no.

43, Plaintiffs bring two claims on behalf of a putative class of Cray shareholders: (1)

violations of Section 10(b) of the Exchange Act and Rule 10b-5 by all Defendants; and (2)

ORDER  -1-

1  violations of Section 20(a) of the Exchange Act by each of the Individual Defendants.

2  Defendants move to dismiss the Complaint in its entirety under FED. R. CIV. P. 12(b)(6) for

3  failure to state a claim upon which relief can be granted.

4        Cray is a publicly owned company organized under the laws of, and operating

5  principally within, the State of Washington.  Compl. ¶ 11.  Cray designs, develops, markets

6  and services supercomputers.  Id. ¶ 28.  Plaintiffs claim to represent a class of purchasers of

7  Cray's publicly-issued common stock during a period from October 23, 2002, through May

8  9, 2005 (the "Class Period").  Id. ¶ 1.  Cray's stock was priced at $4.52 per share at the

9  opening of the Class Period, rose to a high of $13.49 on October 9, 2003, and fell to $2.08 by

10  the close of the Class Period.  Id. ¶¶ 3, 119.  Plaintiffs allege that, during the Class Period,

11  Defendants knowingly or recklessly made several false or misleading material statements

12  regarding the following matters: (1) Cray's earnings guidance for 2004; (2) the prospects and

13  profitability of Cray's "Red Storm" product; (3) the accuracy of Cray's SEC filings and

14  financial statements; and (4) the reliability of Cray's internal controls.  Id. ¶¶ 36-49.

15  Plaintiffs allege that the Defendants' false or misleading statements had the effect of

16  artificially inflating Cray's stock, harming the respective purchasers of that stock during the

17  Class Period when the false or misleading statements were revealed to the public.  Id. ¶¶ 155-

18  59, 173-75.

19        Cray's Earnings Guidance for 2004

20        Plaintiffs allege that several facts, taken collectively, demonstrate that the Defendants

21  made materially false or misleading statements with the intent to deceive or with deliberate

22  recklessness.  First, Plaintiffs allege that Defendants misrepresented the ongoing demand for

23  Cray's X1 system.  Cray developed the X1 in 2001-2002.  Id. ¶ 32-34.  Based largely on

24  orders for the X1, Cray was profitable in 2002 and early 2003.  Id. ¶ 33.  By the end of the

25  first quarter of 2003, Cray had an order backlog for the X1 of approximately $180 million.

26  Id. ¶ 49.  However, that backlog decreased steadily throughout 2003 to $100 million by the

1   end of 2003.  Id.  Plaintiffs allege that as demand for the X1 decreased during 2003,

2   Defendants continued to publicly suggest that Cray's overall sales and growth would

3   increase in 2004.  Id. ¶¶ 70, 74, 80, 82, 85, 87.

4   Second, Plaintiffs allege that Defendants inflated earnings by recording a deferred tax

5   asset at a time when such action was improper under Generally Accepted Accounting

6   Principles ("GAAP").[1]  Cray reported the "asset" in the fourth quarter of 2003 and first and

7   second quarters of 2004.  Plaintiffs allege that recording this asset overstated Cray's net

8   income by $42 million and had the effect of "signaling" to investors that Cray would be

9   profitable enough in 2004 to make full use of the asset when, in fact, Cray had no reasonable

10  basis to expect such profitability.  Id. ¶¶ 123-130.  In the third quarter of 2004 Cray changed

11  its recording of the asset, utilizing the asset only in part instead of in its entirety.  Id. ¶ 129.

12  Third, Plaintiffs allege that Cray's Forms 10-K and 10-Q were false or misleading

13  because Cray failed to disclose that it had a practice of giving away equipment to customers

14  in order to accelerate customer acceptances of X1 systems.  Id. ¶¶ 41-42.  The completion of

15  a sale of a Cray product was generally conditioned on a formal customer acceptance.

16  Plaintiffs allege that a confidential witness ("CW") stated that Cray "would give away

17  equipment or another cabinet of processors 'to get acceptance to happen' in situations in

18  which customer acceptances dragged out."  Id. ¶ 41 (CW3, former software engineer).  This

19  practice, Plaintiffs assert, had a materially favorable impact on Cray's net revenues and,

20  therefore, should have been disclosed on the Management Discussion & Analysis (MD&A)

21  sections of Cray's SEC filings for 2004.  Id. ¶¶ 41-42.

22  Finally, Plaintiffs allege that several facts create a strong inference that Defendants'

23  allegedly false and misleading statements were made intentionally or with deliberate

24

25  _____

26  [1] A "deferred tax asset" allows a company to recognize the benefit of deductible amounts, deductions, or credits that cannot be utilized in one year in future years.  It has the effect of reducing taxable income or taxes payable in future years.  Compl. ¶ 123 n.1.

ORDER   -3-

1   recklessness.  Plaintiffs rely on CW1, a former Cray senior financial analyst.  Id. ¶ 37.  CW1

2   claims that she complained to Poteracki that Cray had internal control weaknesses and

3   reported that Cray's forecasting process was completely inadequate.  Id. ¶ 37-38.  Plaintiffs

4   also allege that Defendants' intent may be inferred from the fact that the Individual

5   Defendants sold approximately 300,000 shares of Cray stock between February 2003 and

6   January 2004, as well as Cray's use of its "artificially inflated stock" to acquire another

7   company, OctigaBay, in April 2004.  Id. ¶¶ 12-15, 89, 151-53.

8          Cray's Red Storm Contract

9          In October 2002, Cray contracted with Sandia National Laboratories ("Sandia") to

10  design and deliver a $90 million system known as "Red Storm," which Cray indicated was a

11  proto-type for a new low-cost commercial computer system, the XT3.  Id. ¶ 32.  Cray

12  recognized revenue from the Red Storm project based on the percentage of completion

13  method, which relied on cost estimates and project milestones.  Id. ¶ 44.  Cray shipped the

14  Red Storm hardware to Sandia in the fall of 2004 but, as alleged by Plaintiffs, the software

15  was not complete as of that shipment.  Id. ¶ 46.

16         Plaintiffs allege that Cray issued several false or misleading statements concerning the

17  progress and profitability of the Red Storm project in 2003 and 2004.[2]  For example,

18  Plaintiffs allege that in April 2003 Rottsolk stated that Red Storm was "on target" for

19  delivery in 2004 and "moving forward quite smoothly" and that Cray had "achieved all

20  important milestones along the way."  Id. ¶ 70.  In October 2003, Defendants stated that they

21  expected to recognize $45 million in revenue under the Red Storm contract in 2004 and reach

22  the "final acceptance milestone" in fourth quarter 2004.  Id. ¶ 80.  In January 2004, Rottsolk

23  stated that Red Storm "continue[d] to move forward steadily" and there was "tremendous

24  _____

25  [2] Plaintiffs also suggest in their "Statement of Facts" section that there were GAAP violations
    related to Red Storm's "percentage of completion" method of recognizing revenue.  Pls.'
26  Opp., at 7; Compl. ¶¶ 44-45.  Because these allegations are vague and unsupported by
    argument in Plaintiffs' opposition, the Court will not consider them further.

market interest" in the commercial version of Red Storm, the XT3, which was factored into revenue guidance for 2004.  Id. ¶ 86.  Finally, in November 2004, Rottsolk stated that Red Storm would be "a breakeven contract."  Id. ¶ 104.

Plaintiffs allege that, in spite of these optimistic comments, Defendants were aware that Red Storm was not moving forward on schedule and would not be profitable.  Plaintiffs allege that CW3, a software engineer, reported delays in Red Storm's software development to his supervisors, though not to the Defendants, and states now that Cray was "prevented from meeting 'milestone' deadlines" for Red Storm production.  Id. ¶ 45.  Similarly, CW6, a senior software engineer, states that "personnel working on the Red Storm project were already confronting and discussing schedule slippages early in 2003."  Id. ¶ 47.  CW4, a systems test engineer, and CW5, a Sandia employee, both state that Red Storm was "not operational" when Cray shipped it to Sandia in the fall of 2004 and "Sandia had to organize an emergency team to finish the software development."  Id. ¶ 46.  CW8, a Cray technical specialist, states that in April 2004, Cray's suppliers began demanding that Cray pay for parts in advance, which slowed the production of Red Storm and the XT3.  Id. ¶ 49.  Based on the delays, the Red Storm contract was not completed until September 2005, which was approximately one year behind schedule.  Id. ¶ 46.

Defendants note that Cray included several cautionary disclosures in its SEC filings regarding Red Storm.  On March 28, 2003, Cray issued a 10-K filing, which stated that Cray "may not be successful in completing the Red Storm project on time and on budget, which would adversely affect our earnings."  Rosenbaum Decl., docket no. 52, Ex C. at 65.  Elaborating on this point, the 10-K noted Red Storm's tight development schedule, reliance on third-party suppliers, reliance on continued government funding, and that the "development and delivery" of the project "are subject to significant risks."  Id.  These warnings indicated that future events and projections may be different than actual results and referred the participants to the "Risk Factor" sections of Cray's SEC filings.  Id., Exs. BB

1  (July 31, 2003, statement that it was "too early to look forward to some backlog increase

2  from Red storm"); DD (revenues for Red Storm "required time for completion of critical

3  engineering milestones in order to launch as planned"); FF (Red Storm experienced "a few

4  bumps along the way" that "pushed out the product launch dates" and had "delays in

5  fabrication of key" parts).  Defendants also refer to cautionary warnings provided at the

6  opening of its conference calls with investment analysts.  Id., Exs. W-GG.

7       False or Misleading SEC Filings

8       Plaintiffs allege that the improper booking of the deferred tax asset discussed above

9  resulted in false or misleading SEC filings.  Because the booking of the asset had the effect

10  of increasing income and shareholders' equity, Plaintiffs allege that it rendered Cray's

11  financial statements filed with the SEC false or misleading.  Id. ¶ 122-130.  Plaintiffs allege

12  that this was common knowledge because CW2, a senior procurement agent for Cray who

13  worked in Cray's Chippewa Falls facility, states that "talk" of Cray "fudging its books"

14  spread like wildfire through the Chippewa Falls community.  Compl. ¶ 39.  The date or dates

15  that CW2 learned this information are not stated in the Complaint.  Id.

16       False or Misleading Statements Concerning Cray's Internal Controls

17       Plaintiffs allege that Defendants Rottsolk and Poteracki issued false or misleading

18  statements when they signed executive certifications as required by Section 302 of the

19  Sarbanes-Oxley Act of 2002 ("SOX"), 15 U.S.C. § 7241.  Rottsolk and Poteracki certified

20  that Cray had designed disclosure controls and procedures to ensure that material information

21  was made known to them and they disclosed all significant deficiencies in the design or

22  operation of internal controls that could adversely affect Cray's ability to record, process,

23  summarize, and report financial data.  Id. ¶¶ 53, 65, 71, 75, 81, 90, 93, 97, 107 (signed SEC

24  filings).  In March 2005, Defendants issued a SOX 404 disclosure stating that they expected

25  to identify one or more material weaknesses in Cray's internal controls.  And on May 3,

26  2005, Defendants filed an amended 10-K acknowledging "material weaknesses in [Cray's]

1  internal control over financial [data]" and stating that their "disclosure controls and

2  procedures were not effective."  Id. ¶ 117

3         Defendants' Stock Sales

4         Plaintiffs rely on the stock sales of four of the Defendants to adequately plead that

5  Defendants knew their statements and actions were false or misleading, or acted with

6  deliberate recklessness.  The facts relevant to the sales of each Defendant are as follows[3]:

7              1.   Johnson

8         Johnson sold 39,000 shares of Cray stock during the Class Period, representing 7.06%

9  of his total holdings.  Id. ¶ 15.  Johnson sold shares between August 26, 2003, and January 5,

10  2004.  Id. ¶ 152.  Johnson conducted equal sales of 6,500 shares on August 26 ($11.33),

11  September 2 ($12.63), October 6 ($13.30), November 3 ($12.51), December 2, 2003

12  ($10.01), and January 5, 2004, ($10.14).  The value of Johnson's total stock sales was

13  $454,520.00.  Id.

14              2.   Kiefer

15         Kiefer sold 81,500 shares of Cray stock during the Class Period, representing 14.4%

16  of his total holdings.  Id. ¶ 13.  Kiefer sold shares between August 27, 2003 and January 12,

17  2004.  Kiefer sold 30,000 shares on August 27 ($11.74), 11,500 shares on August 28

18  ($11.46), 10,000 shares on September 8 ($13.26), 10,000 shares on October 13 ($13.31),

19  10,000 shares on November 10, 2003 ($12.20), and 10,000 shares on January 12, 2004

20  ($11.28).  The value of Kiefer's total stock sales was $996,105.00.  Id. ¶ 152.

21              3.   Poteracki

22         Poteracki sold 37,697 shares of Cray stock during the Class Period, representing

23  25.55% of his total holdings of Cray common stock.  Id. ¶ 14.  Poteracki sold shares on

24

25

26  [3] At argument, Plaintiffs stated that they miscalculated the percentage of shares sold in the
Complaint.  The percentages listed in this Order represent the correct calculations.

November 3, 2003, for an average price of approximately $12.55 per share.  The value of Poteracki's total stock sales was $473,198.00.  Id. ¶ 152.

### 4. Rottsolk

Rottsolk sold a total of 175,000 shares of Cray stock during the Class Period, representing 9.33% of his total holdings of Cray common stock.  Id. ¶ 12.  Rottsolk sold 100,000 shares on February 19, 2003, for $5.83 per share during a prospectus sale.  Rottsolk then sold 15,000 shares on August 14, 2003 ($11.89), 15,000 shares on September 8, 2003 ($13.16), 15,000 shares on October 13, 2003 ($13.29), 15,000 shares on November 10, 2003 ($12.21), and 15,000 shares on January 12, 2004 ($11.25).  The value of Rottsolk's stock sales was $1,509,907.00.  Id. ¶ 152.  If the 100,000 shares sold by Rottsolk at $5.38 per share pursuant to the February 19, 2003, prospectus are not included, Rottsolk sold approximately 4.01 % of his holdings for a total of $971,907.00.

### Plaintiffs' Claims

Based on the foregoing, Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which implements Section 10(b) of the 1934 Act.[4]  Plaintiffs also allege that the Individual

---

[4] Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of . . . any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 provides that it is unlawful to use any facility of the national securities exchange "[t]o employ any device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b-5(a).  Rule 10b-5 further states that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  Id. § 240.10b-5(b).

1   Defendants are liable under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), which

2   provides that controlling persons shall be liable for violations of the 1934 Act committed by

3   another person within their control.

4       Motions to Strike

5       In footnote 10 of Plaintiffs' Opposition, Plaintiffs raise what appears to be a motion to

6   strike Exhibit A of the Rosenbaum Declaration.  Docket no. 53, at 16.  Exhibit A summarizes

7   a lengthy list of "disclosure" statements made in Cray's SEC filings or analyst conference

8   calls, which are apparently taken from other exhibits included in the Rosenbaum Declaration.

9   See Defs.' Reply, docket no. 57, at 9 n.5.  Defendants contend that these statements refute

10  Plaintiffs' allegations that Defendants misled investors.  Plaintiffs argue that this summary

11  "constitutes 39 pages of additional argument over and above the 38 page limitation on briefs

12  in this case and should be disregarded."  Pls.' Opp., at 16 n.10.  Because it is a

13  summarization of statements taken from other unopposed exhibits in the Rosenbaum

14  Declaration, and contains no meaningful argument from counsel, Exhibit A is not improper.

15  Plaintiffs' motion to strike is DENIED.

16      In footnote 4 of Defendants' Reply, Defendants move to strike a copy of a study by

17  Professor Alan D. Jagolinzer of Stanford University titled *Do insiders trade strategically*

18  *within the SEC Rule 10b5-1 safe harbor?*, which is provided as Exhibit A to the Pacharzina

19  Declaration.  Reply at 8.  Defendants argue that the study is improper because (1) it contains

20  multiple levels of hearsay, and (2) it is evidence outside the scope of a Rule 12(b)(6) motion

21  to dismiss, which is limited to the Complaint and documents of which the Court may take

22  judicial notice.  Defendants are correct on both accounts and, therefore, the motion to strike

23  is GRANTED.

24  ///

25  ///

26  ///

1  **DISCUSSION**

2  **I.        Defendants Motion to Dismiss**

3          A complaint should not be dismissed for failure to state a claim unless it appears

4  beyond doubt that the plaintiff can prove no set of facts in support of the claim that would

5  entitle the plaintiff to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); No. 84

6  Employee-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320

7  F.3d 920, 931 (9th Cir. 2003), cert denied, 540 U.S. 966 (2003).  All allegations of material

8  fact are taken as true and construed in the light most favorable to the nonmoving party.

9  America West, 320 F.3d at 931; In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983

10  (9th Cir. 1999).  The elements of a 10b-5 claim include: (1) a material misrepresentation or

11  omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4)

12  transaction and loss causation; and (5) economic loss.  See In re Daou Sys., Inc., Sec. Litig.

13  (Daou II), 411 F.3d 1006, 1014 (9th Cir. 2005).

14          In a securities fraud case, a heightened pleading standard applies for a motion to

15  dismiss under FED. R. CIV. P. 12(b)(6).  FED. R. CIV. P. 9(b) generally requires that pleadings

16  of fraud must state the circumstances constituting fraud with particularity.  The Private

17  Securities Litigation Reform Act of 1995 ("PSLRA") amended the 1934 Act, and imposed

18  heightened pleading requirements for private securities fraud claims.  Silicon Graphics, 183

19  F.3d at 974.  The PSLRA requires that a complaint alleging securities fraud must "specify

20  each statement alleged to have been misleading, the reason or reasons why the statement is

21  misleading, and, if an allegation . . . is made on information and belief, the complaint shall

22  state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

23  Plaintiffs must "state with particularity facts giving rise to a *strong inference* that the

24  defendant acted with the required state of mind."  Id. § 78u-4(b)(2) (emphasis added).

25  Plaintiffs "must plead, *in great detail*, facts that constitute strong circumstantial evidence of

26  deliberately reckless or conscious misconduct."  Silicon Graphics, 183 F.3d at 974 (emphasis

1   added).  The PSLRA provides that a complaint must be dismissed if a plaintiff fails to plead

2   the alleged misleading statements or scienter with particularity.  15 U.S.C. § 78u-4(b)(3)(A).

3   The Ninth Circuit has merged the PSLRA's dual pleading requirements for scienter and

4   falsity into "a single inquiry" because falsity and scienter are "generally strongly inferred

5   from the same set of facts."  Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001).  "In

6   considering whether a private securities fraud complaint can survive dismissal under Rule

7   12(b)(6), [the Court] must determine whether particular facts in the complaint, taken as a

8   whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness

9   made false or misleading statements."  Id. (internal quotation marks and citations omitted).

10         Defendants argue that Plaintiffs implicitly and improperly rely on the group pleading

11   doctrine throughout the Complaint.  Pre-PSLRA, plaintiffs could bring securities fraud

12   allegations that every defendant was responsible for "group published" material, such as

13   prospectuses, annual or quarterly reports, or press releases issued by less than all of the

14   defendants.  In re GlenFed, Inc., Sec. Litig., 60 F.3d 591, 593 (9th Cir. 1995).  The Ninth

15   Circuit has yet to determine whether the group pleading doctrine survived the PSLRA and

16   district courts within the Ninth Circuit have split on the issue.  See, e.g., In re Secure

17   Computing Corp. Sec. Litig., 120 F. Supp. 2d 810, 821-22 (N.D. Cal. 2000) (group pleading

18   still viable in Ninth Circuit); In re Lattice Semiconductor Corp. Sec. Litig., 2006 WL 538756

19   *20 (D. Or. Jan. 3, 2006) (same).  But see also S. Ferry LP #2 v. Killinger, 399 F. Supp. 2d

20   1121, 1143 n.8 (W.D. Wash. 2005) ("group pleading doctrine is no longer viable"); In re

21   Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1028-30 (S.D. Cal. 2005) (same).

22   Although Defendants raise the issue, they do not specify which allegations improperly rely

23   on the doctrine.  In any event, the Court need not decide whether the doctrine is still viable as

24   this motion is resolved in Defendants' favor on other grounds.

25

26

1

### A.    Plaintiffs' Use of Confidential Witnesses[5]

2    Plaintiffs' Complaint relies heavily on the statements of several confidential witnesses

3 employed at Cray or, in one case, Sandia.  Compl. ¶¶ 37, 39, 41, 46, 47, and 49.  Defendants

4 argue that Plaintiffs' reliance on these unidentified confidential witnesses does not satisfy the

5 pleading standards of the PSLRA.  See Daou II, 411 F.3d at 1015 (PSLRA requires

6 confidential witnesses ("CWs") to be "described with sufficient particularity to support the

7 probability that a person in the position . . . would possess the information alleged [along

8 with] adequate corroborating details").  Defendants argue that there is a lack of information

9 as to how and when the CWs acquired the knowledge that Plaintiffs rely on, and at what

10 point during the Class Period the knowledge was communicated or made known to the

11 Defendants.  Plaintiffs respond that the Complaint adequately relies on CWs because it

12 contains detailed job titles, specific dates of employment, and the basis for their knowledge.

13 Pls.' Opp. at 24.  Plaintiffs also contend that the CWs' statements are sufficiently reliable

14 because, in some cases, they corroborate one another.

15    The precise amount of detail required in describing confidential witnesses varies

16 based on the circumstances of the case.  Secure Computing, 184 F. Supp. 2d at 988.

17 Plaintiffs are not required to name witnesses.  Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir.

18 2000); In re SeeBeyond Techs. Corp. Sec. Litig., 266 F. Supp. 2d 1150 (C.D. Cal. 2003); In

19 re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1271 (N.D. Cal. 2000).  "To

20 contribute meaningfully toward a 'strong inference' of scienter, however, allegations

21 attributed to unnamed sources must be accompanied by enough particularized detail to

22 support a reasonable conviction in the informant's basis of knowledge."  In re NorthPoint

23

24 ───────────────

25 [5] The discussion regarding confidential witnesses in this section deals only with whether the
Complaint sufficiently describes the confidential witnesses and the basis for their personal
26 knowledge.  The issue of whether Plaintiffs' reliance on particular confidential witnesses is
adequate to plead falsity and/or a strong inference of scienter as to each of Plaintiffs' claims
is discussed in the following section.

1  Communications Group, Inc., Sec. Litig. ("NorthPoint II"), 221 F. Supp. 2d 1090, 1097

2  (N.D. Cal. 2002) (citation omitted).  Plaintiffs must plead "with substantial specificity" how

3  confidential witnesses "came to learn of the information they provide in the complaint."  In

4  re NorthPoint Communications Group, Inc. Sec. Litig. ("NorthPoint I"), 184 F. Supp. 2d 991,

5  999-1001 (N.D. Cal. 2001).  "The Court must be able to tell whether a confidential witness is

6  speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'"  In re

7  Metawave Communications Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1068 (W.D. Wash.

8  2003) (citing In re Commtouch Software Ltd. Sec. Litig., No. 01-719, 2002 U.S. Dist. LEXIS

9  13742, at *10 (N.D. Cal. July 24, 2002)).  The Court can look to "the level of the detail

10  provided by the confidential witnesses, the corroborative nature of the other facts alleged

11  (including from other sources), the coherence and plausibility of the allegations, the number

12  of sources, the reliability of the sources, and similar indicia."  In re Cabletron Sys., Inc., 311

13  F.3d 11, 29-30 (1st Cir. 2002).

14          In Daou II, the Ninth Circuit stated that the plaintiffs described the CWs with "a large

15  degree of specificity" where they (1) numbered each witness, (2) described his or her job

16  description, and (3) described his or her job responsibilities.  411 F.3d at 1016.  For example,

17  the plaintiffs in Daou II described their CW9 as "Vice President of Sales . . . [who] was

18  responsible for reporting weekly or bi-weekly sales information, such as sales status/backlog

19  and forecast/pipeline information, to Daou's Vice Presidents and corporate officers."  Id.

20  Similarly, in S. Ferry LP #2, the Court found that the plaintiffs sufficiently established that

21  some of the CWs "were in a position to have personal knowledge of the information about

22  which they spoke."  399 F. Supp. 2d at 1140.  The S. Ferry LP #2 Court noted that the

23  plaintiffs provided the CWs job titles, time period of employment, work location, and a brief

24  job description.  Id.  For those CWs that the Court found reliable, the Court also noted that

25  there was a "consistent and interlocking nature" to the evidence presented.  Id.  However, the

26  S. Ferry LP #2 Court rejected several of the CWs allegations where the plaintiffs failed to

1  explain what the CWs did in his or her job and how the CWs' responsibilities included

2  exposure to the relevant information.  Id. at 1140-41.

3        1.     Descriptions of Confidential Witnesses and their Personal Knowledge

4        Plaintiffs' descriptions of the eight CWs in paragraphs 37-39, 41, 45-47, and 49

5  sufficiently describes their job titles and dates of employment in all but two cases (discussed

6  below).  The following is an analysis of each CWs allegations and the reliability of those

7  allegations under the PSLRA.

8        The Complaint describes CW1 as "a former senior financial analyst who worked at

9  Cray's Chippewa Falls, Wisconsin facility from 2000 to February 2005."  Id. ¶ 37.  CW1

10  states that Cray's "internal costs weaknesses" existed from the beginning of the Class Period

11  and were known or recklessly disregarded by Defendants.  Id.  CW1 claims that "throughout

12  her tenure at the Company she had complained to defendant Poteracki about many of the

13  material internal control weaknesses" and that she was demoted as a result.  Id.  CW1 then

14  claims that her replacement, Dan Shuda ("Shuda"), "moved costs from expenses to assets by

15  making journal entries."  Id.  Notably absent from the Complaint are (1) how and when

16  CW1, as a senior financial analyst in Chippewa Falls, became aware of Cray's "internal

17  weaknesses," (2) the extent of her understanding of the "weaknesses" and whether those

18  weaknesses relate to the SOX 302 certifications and SOX 404 assessment; (3) at what times

19  CW1's "complaints" were made and to whom, and (4) the nature and content of these

20  specific complaints.  See Dauo II, 411 F.3d at 1015-16 (source should be described with

21  sufficient particularity to support the probability that a person in the position occupied by the

22  source would possess the information alleged) (citation omitted).  Additionally, CW1

23  provides no basis to impute her observations about Shuda to the Defendants.  The Complaint

24  also alleges that Shuda, rather than CW1, actually prepared accounting journal entries, which

25  suggests that CW1's knowledge of the effect of Shuda's actions is limited.  In sum, CW1's

26

1   allegations as presently stated are too vague and are not supported by an adequate description
2   of her personal knowledge or actions.

3       CW2 is described as "[a] former senior procurement agent for Cray who worked in the
4   Company's Chippewa Falls facility" who states that "talk that Cray was 'fudging its books'
5   spread like wildfire through the Chippewa Falls community." Id. ¶ 39. The Complaint does
6   not provide the dates of CW2's employment. This is a fatal flaw. Moreover, the allegation
7   fails as it is "merely regurgitating gossip and innuendo." Metawave, 298 F. Supp. 2d at
8   1068.

9       CW3 is described as "a former software engineering manager who worked in the
10  Company's Mendota Heights, Minnesota facility from 1985 to August 2004." Id. ¶ 41.
11  According to CW3, Cray would "give away equipment or another cabinet of processors 'to
12  get acceptance to happen' in situations in which customer acceptance dragged out." Id. The
13  Complaint does not explain how this "software engineering manager" became aware of the
14  equipment giveaway policy, when or how frequently the giveaways occurred, the value of
15  the equipment, or who knew about the giveaway policy and when. Plaintiffs' allegation that
16  the failure to disclose these giveaways in the MD&A section of Cray's SEC filings rendered
17  them materially false or misleading are conclusory and without any facts to support the
18  materiality of the giveaways. Thus, these allegations by CW3 are vague.

19      CW3 also states that delays in software development related to Red Storm prevented
20  Cray from meeting "milestone" deadlines under the Sandia contract and that CW3 reported
21  these problems to two Cray Vice Presidents. Id. ¶ 45. The Complaint does not indicate
22  whether CW3 worked on Red Storm, though Plaintiffs acknowledge in their brief that he did
23  not. See Pls.' Opp., at 24 n.18 (only CW4 and CW6 worked on Red Storm and Plaintiffs
24  seek leave to amend to state this if necessary).[6] As a software engineer manager, CW3

25

26  ---

[6] In ruling on a motion to dismiss, the Court must look only to the Complaint and public
documents of which the Court may take judicial notice. However, the Court recognizes the

ORDER  -15-

1   would have likely been privy to software development problems, but his knowledge of Red

2   Storm is necessarily limited because he did not work on the project.  The allegation that

3   "CW3 reported that these issues [relating to Red Storm] were known to his supervisors

4   during the Class Period" is not based on personal knowledge and would be inadmissible at

5   trial.  See Compl. ¶ 45.

6        CW4 is described as a "former systems test engineer who worked in Chippewa Falls

7   from 1985-2005."  Id. ¶ 46.  CW4 states that the development of the Red Storm software

8   "was significantly behind schedule" and was not operational when the hardware was shipped

9   to Sandia in the Fall of 2004.  Id.  Again, the Complaint does not detail CW4's work on Red

10  Storm, but Plaintiffs state that he did work on the project in their brief.

11       CW5 was not a Cray employee.  CW5 was a "Director of Computers, Computation,

12  and Mathematics for Sandia, who oversaw the Red Storm project."  Id.  CW5 corroborates

13  the statements of the Cray CWs who stated that the Red Storm software was "dead in the

14  water" when Cray shipped the Red Storm hardware to Sandia in the Fall of 2004 and Sandia

15  had to organize an emergency team to finish the software development.  Plaintiffs adequately

16  state the job title and basis for personal knowledge for CW5.

17       CW6 was a "senior software engineer in Cray's Seattle, Washington offices from

18  2002 until July 2004."  Id. ¶ 47.  As with CW3, CW4 and CW5, CW6 alleges that the Red

19  Storm project had software problems, stating that "personnel working on the Red Storm

20  project already were confronting and discussing scheduling slippages early in 2003."  Id.

21  CW6 also claims that the "software development for the project was a constant issue due to

22  redesigns of the hardware that occurred during the project."  Id.  As a senior software

23  engineer who, according to Plaintiffs' brief, worked on the Red Storm project, CW6 was

24

25

26  ease with which Plaintiffs might amend the Complaint to indicate whether or not any
    particular CW worked on the Red Storm project.  See also CW4, CW6, and CW7 below.  For
    purposes of this motion, the Court will assume that CW4 and CW6 worked on Red Storm.

1   likely to have personal knowledge of Red Storm's software problems.  However, CW6's

2   statements that personnel were "confronting and discussing scheduling slippages" is simply

3   too general and too vague to support a securities fraud claim.

4          The Complaint alleges that CW7 was a "senior software specialist in Cray's Mendota

5   Heights, Minnesota facility" who "confirmed that the fact that the Red Storm project was in

6   trouble was openly discussed within the Company."  Id.  Plaintiffs do not provide the dates

7   of CW7's employment and his claim regarding "open discussion" within the Company is too

8   vague to meet the heightened PLSRA standard.  Moreover, according to Plaintiffs' brief,

9   CW7 did not work on Red Storm.

10         Finally, CW8 is described as having "worked as a technical specialist in Chippewa

11  Falls from 1994 - June 2005."  Id. ¶ 49.  According to CW8, "Cray began having issues with

12  its suppliers around the time of the OctigaBay acquisition [in April 2004]," and "several

13  vendors began demanding that Cray pay for parts in advance," which "hindered Cray's

14  ability to complete major projects, including Red Storm, on schedule."  Id.  CW8 did not

15  work on the Red Storm project.  While CW8 corroborates the claims of other CWs that Cray

16  was suffering delays in the Red Storm project, the Complaint does not adequately describe

17  the basis for any personal knowledge concerning "issues with [Cray's] suppliers" or any

18  demands for payment in advance.  Such statements are vague.

19         Based on the foregoing, the Court concludes that the Complaint does not sufficiently

20  describe CW1, CW2, CW3, CW7, and CW8 because it fails to provide a detailed basis for

21  their personal knowledge, the allegations are vague, and/or the Complaint does not provide

22  dates of employment (CW2 and CW7).  In contrast, CW4, CW5, and CW6 appear from their

23  job titles to have some personal knowledge of the fact that the Red Storm project suffered

24  significant production delays, particularly with regard to software, during the Class Period.

25  The production-delay statements of these CWs corroborate one another.  However, the extent

26  of those delays, whether the Individual Defendants were aware of the delays, and the timing

1    of such awareness is not established by Plaintiffs' allegations.  Applying these limitations to

2    the use of CWs, the next question is whether the Complaint adequately pleads falsity and

3    scienter under the PSLRA.

4             **B.      Falsity and Scienter**

5             In a securities fraud case, a fact is material under Section 10(b) and Rule 10b-5 if

6    there is "a substantial likelihood that the disclosure of the omitted fact would have been

7    viewed by the reasonable investor as having significantly altered the 'total mix' of

8    information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting

9    TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

10            In pleading scienter, the Ninth Circuit requires that a defendant's state of mind be one

11   of "deliberate or conscious recklessness."  America West, 320 F.3d at 931 (quoting Silicon

12   Graphics, 183 F.3d at 979).  Mere motive and opportunity are not enough.  Silicon Graphics,

13   183 F.3d at 979.  The Court must look at all the circumstances in determining whether there

14   is a strong inference of scienter.  Id. at 984-87.  Particularized facts and corroborating details

15   should support each allegation.  Id. at 985.  Aside from the individual allegations, the Court

16   considers "whether the total of plaintiffs' allegations, even though individually lacking, are

17   sufficient to create a strong inference that defendants acted with deliberate or conscious

18   recklessness."  Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).  In

19   determining whether there has been a strong inference of scienter, the Court must consider

20   "*all* reasonable inferences to be drawn from the allegations, including inferences unfavorable

21   to the plaintiffs."  America West, 320 F.3d at 938 (quoting Gompper v. VISX, Inc., 298 F.3d

22   893, 897 (9th Cir. 2002)) (emphasis in original).

23            In this case, Plaintiffs contend that the Complaint should survive Defendants' motion

24   to dismiss because they have adequately pled that four sets of statements or actions by the

25   Defendants were false or misleading and made with scienter: (1) Defendants' earnings

26   guidance statements for 2004; (2) Defendants' statements touting the progress and

1   profitability of the Red Storm project and its commercial equivalent, the XT3; (3)

2   Defendants' inclusion of the tax deferred asset in their SEC filings and failure to discuss the

3   equipment giveaway policy; and (4) the SOX 302 certifications by Rottsolk and Poteracki

4   stating that Cray had adequate internal controls.  Pls.' Opp., at 16-32.  Defendants argue that

5   Plaintiffs' claims based on these sets of facts must be dismissed because (1) the statements

6   were not false or misleading, and (2) even if they were false or misleading, the Complaint

7   does not sufficiently plead scienter.

8                               1.        Earnings Guidance for 2004

9                                    a.        False or Misleading

10          Plaintiffs contend that Defendants made several false or misleading statements during

11  the Class Period concerning Cray's earnings expectations for 2004.  Pls.' Opp., at 17-21.

12  The allegedly false or misleading 2004 earnings statements were issued as follows:

13          Rottsolk in March 4, 2003, Press Release: "While it is premature to provide
            specific revenue guidance for 2004, we do expect to experience continued
14          strong growth."  Compl. ¶ 61.

15          Rottsolk at April 30, 2003, conference call: Plaintiffs allege that, once again,
            Defendants declined to offer specific guidance for 2004 but expressed
16          confidence that Cray "would continue to experience continued strong growth"
            in 2004.  Id. ¶ 70.
17
            Rottsolk at July 31, 2003, conference call: He was "very optimistic about
18          2004" and was "expecting the first quarter [2004] to be good."  Id. ¶ 74.

19          Poteracki at October 30, 2003, conference call: "Confident about [Cray's]
            prospects for growth" in future periods.  Id. ¶ 80.
20
            Ungaro at December 10, 2003, Analyst Day: Indicated that the supercomputer
21          industry had 15-20 requests for proposals currently active and that this number
            could double over the next three months.  Id. ¶ 82.  Ungaro also stated that the
22          XT3 would reach market in 2004 and more than double the market for Cray
            products by 2005.
23
            Rottsolk in January 29, 2004, Press Release: "The outlook for 2004 and 2005
24          for Cray is promising and we are confident in our long-term growth prospects
            as well as our ability to execute."  "We've set a high bar for ourselves in 2004,
25          planning to grow revenue to about $300 million while achieving operating
            profit in the range of eight to twelve percent of revenue.  Our plan depends
26          primarily on the timely and successful introduction of two new products, the

Cray X1E and commercialized Red Storm systems, both which we plan to launch in the second half of 2004." Id. ¶ 85.

Ungaro at January 29, 2004, conference call: "[W]e're seeing customers not holding back, as of today, in purchasing the X1 and not waiting for the X1E. So we have not seen any stalling of our marketplace right now towards the X1E . . . [b]ut we right now see very, very strong demand and excitement – and not any weakening in our market position for customers waiting for the X1E primarily because of this very low-cost upgrade patch." Id. ¶ 87.

In cases involving improper revenue recognition, the Ninth Circuit has suggested that Plaintiffs should allege "(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any transactions; or (4) the identities of the customers or company employees involved in the transactions." Daou I, 397 F.3d at 713. Although Plaintiffs' allegations here are based on future projections of Cray's revenue and earnings prospects rather than actual misstatements of current revenue or earnings, the pleading considerations are similar. That is, Plaintiffs must adequately allege the "basic details" suggesting that Defendants' 2004 earnings guidance was false or misleading.

Defendants contend that the statements relied upon by Plaintiffs are not demonstrably false or misleading for several reasons. First, Defendants suggest that the statements were immaterial, or mere puffery. To determine whether a statement is mere puffery, the Court must examine whether a statement is so "exaggerated" or "vague" that no reasonable investor would rely on the statement when considering the total mix of available information. Metawave, 298 F. Supp. 2d 1056, 1090; In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2000). In Splash, the court held that statements describing "strong" demand, "better than expected" or "robust" results, a growth strategy that "was unfolding as planned," a "well positioned" company, a "solid" company position, and an "improved" product line were non-actionable puffery. 160 F. Supp. 2d at 1076-77. Here, Defendants vague and opinion-oriented statements from March through October 2003 clearly fall in the category of puffery, as they are nearly identical to those in Splash. See Compl. ¶

1   61 (expect continued strong growth), ¶ 70 (same), ¶ 74 (very optimistic and expecting 2004

2   to be good), ¶ 80 (confident about prospects for growth), ¶ 82 (industry requests "could

3   double" over next three months), ¶ 85 (outlook is promising and Defendants were confident

4   in long-term growth prospects).  However, portions of the statements in December 2003 and

5   January 2004 are more factual and do not qualify as puffery.  See id. ¶ 82 (Red Storm would

6   reach market in 2004), ¶ 85 (planning to grow revenue to about $300 million with operating

7   profit in range of eight to twelve percent of revenue), ¶ 87 (customers not holding back and

8   no weakening in Cray's market position).

9          Plaintiffs suggest that these statements are not puffery because they were preceded by

10  "numerous statements of fact" justifying the optimism.  Pls.' Opp., at 32-33 (citing S. Ferry

11  LP #2, 399 F. Supp. 2d at 1129).  In S. Ferry LP #2, the Court noted that what might be

12  puffery standing alone may become actionable if it is an integral part of a representation of

13  material fact.  Id.  However, the statements cited by Plaintiffs that surround the "puffery" are

14  either not alleged to be false when made or are themselves immaterial.  See e.g., Compl. ¶ 61

15  (revenue guidance for 2003 raised to at least $220 million based on "current order flow,"

16  profitability at "high end" of five to ten percent, Q1 2003 "a record first quarter for orders"

17  and "[d]eliveries for the Cray X1 proceeding on schedule), ¶ 73 (Q2 2003 came in as planned

18  and Cray was getting closer to its target business model), ¶ 79 (Cray received "important new

19  orders" and had "exciting new product plans" in the Q4 2003).  To the extent these

20  statements (most of which are not alleged to be false) have any effect, they raise an inference

21  in Defendants' favor that there was a factual basis for the positive statements concerning

22  2004 earnings.  Id. ¶ 49 (alleging that X1 orders had increased to $180 million by Q1 2003

23  but decreased throughout 2003).

24         Second, Defendants also note that the facts allegedly proving the statements false

25  were publicly known at the time that several of the statements were made.  Specifically,

26  Plaintiffs reliance on the declining orders for Cray's X1 system were disclosed to analysts.

1   Rosenbaum Decl., Exs. BB (disclosing decrease of backlog to $157 million on July 31,

2   2003), DD (disclosing decrease of backlog to $100 million on January 29, 2004); Second

3   Rosenbaum Decl., docket no. 58, Exs. A-C (disclosing backlog on January 30, April 30, and

4   October 30, 2003).  In In re Apple Computer Sec. Litig., the Ninth Circuit noted that the

5   defendants' failure to disclose material information was excused where that information was

6   credibly made known to market.  886 F.2d 1109, 1115 (9th Cir. 1989).  Here, for example,

7   the Defendants' July 31, 2004, statements and those that followed were made while the

8   market was aware that the X1 order backlog had decreased from $180 million to $157

9   million.  And the January 29, 2004, press release and conference call statements were made

10  simultaneously with the disclosure to analysts that the order backlog for the X1 had

11  decreased to $100 million.  Accordingly, the statements concerning the prospects for 2004

12  revenue and earnings were not rendered false or misleading merely by virtue of decreased X1

13  backlog.

14       In addition, almost all of the allegedly false or misleading statements fall within the

15  safe harbor provision for forward-looking statements under the PSLRA.  The safe harbor

16  provides that there is no liability for any (1) forward-looking statement, (2) that is identified

17  as such, and (3) is accompanied by meaningful cautionary statements identifying important

18  factors that could cause actual results to differ materially from those in the forward-looking

19  statement.  15 U.S.C. § 78u-5(c)(1)(A)(i); S. Ferry LP #2, 399 F. Supp. 2d at 1130.

20  "However, a forward-looking statement may be actionable if it was made with actual

21  knowledge that the statement was false or misleading."  Id.; § 78u-5(c)(1)(B).  Defendants

22  maintain that all of the statements identified by Plaintiffs fall in the category of a forward-

23  looking statement accompanied by a meaningful cautionary statement.  Defendants are

24  correct with two exceptions: (1) the December 2003 statement by Ungaro that supercomputer

25  industry had 15-20 requests for proposals currently active; and (2) the January 2004

26  statement by Ungaro that "right now" Defendants were seeing "very, very strong demand

1    and excitement – and not any weakening in our market position for customers waiting for the

2    X1E." Compl. ¶¶ 82, 87.  However, Plaintiffs do not allege that there were not 15-20

3    requests for proposals in the industry or how statements about the industry as a whole could

4    possibly be a basis for false statements regarding Cray's earnings guidance.  The decreased

5    backlog for the X1 was also disclosed to the public at the same time Ungaro made his

6    comments about strong demand for the X1.

7            In response, Plaintiffs do not dispute that most of the statements were forward-looking

8    nor that they were accompanied by cautionary language.  Instead, Plaintiffs argue that the

9    safe harbor does not apply because some of Defendants' statements concerning 2004

10   earnings are not within the safe harbor provisions because they were made with "actual

11   knowledge" that they were false or misleading.  Pls.' Opp., at 31-32.  Plaintiffs argue that

12   Defendant Rottsolk's statement in January 2004 that Cray expected to grow revenue to $300

13   million and achieve operating profit of eight to twelve percent was knowingly false because

14   X1 orders had slowed, new orders were not being received at a rate to sustain such numbers,

15   and there were problems with development and parts suppliers slowing Red Storm and other

16   projects.  As discussed in the following section, the Complaint does not present allegations

17   sufficient to support a strong inference that Rottsolk had "actual knowledge" that his

18   statements were false and, as a result, Defendants forward-looking statements are covered by

19   the safe harbor provision of the PSLRA.

20           Based on the foregoing, Defendants have demonstrated that the Complaint fails to

21   adequately allege the "materially false or misleading" element of a securities fraud claim as

22   to the 2004 earnings guidance.  First, all of the statements, other than portions of those in

23   December 2003 and January 2004, are immaterial puffery.  Second, the statements are not

24   rendered false or misleading as a result of the decreased backlog for the X1 because those

25   decreases were disclosed to the public.  Finally, the PSLRA safe harbor provision exempts

26   Defendants' forward-looking statements from liability.  Although Plaintiffs' claim as to the

1   2004 earnings guidance fails as a matter of law on the "false or misleading" element, the

2   Court will also address Defendants' alternative argument that the claim also fails for failure

3   to adequately plead scienter.

4                                        b.       Scienter

5           Plaintiffs rely on "numerous facts which, when taken collectively, give rise to a strong

6   inference" of scienter as to the 2004 earnings guidance. Pls.' Opp. at 17.  Plaintiffs cite the

7   following: (1) a slowing of X1 system orders; (2) improper use of the deferred tax asset in

8   2003-2004; (3) a policy of giving away equipment to accelerate acceptances; (4) the

9   statements by CW1 that she told Poteracki that the forecasting process was completely

10  inadequate; (5) the sale of approximately 300,000 shares of Cray stock during the Class

11  Period by Defendants (other than Ungaro); and (6) the use of Cray's "artificially inflated

12  stock" to acquire OctigaBay in April 2004.  While Plaintiffs suggest that all six of these

13  allegations demonstrate the scienter element, they focus the majority of their argument on the

14  Defendants' stock sales during the Class Period.  See Pls.' Opp., at 18-21.

15                              i.       Slowing of X1 system, use of deferred tax asset,
                                         equipment giveaways, and statements by CW1
16
17          Plaintiffs' reliance on the alleged slowing of the X1 system orders, use of the deferred

18  tax asset, equipment giveaways, and statements by CW1 is insufficient to provide a "strong

19  inference" of scienter.  First, as a matter of law, the decreasing X1 order backlog provides no

20  evidence of scienter because it was disclosed to analysts in conference calls.  Second, the use

21  of the deferred tax asset, which was allegedly a violation of GAAP, was disclosed on January

22  29, 2004, and the underlying information (i.e., Cray's history of profitability) was known to

23  investors.  Also, the allegation that the Defendants used the asset with the intent to deceive is

24  simply not supported by CW2's conclusory suggestion that there was "talk" of Cray "fudging

25  its books."  CW2 would not be able to testify to these hearsay statements at trial.  Third, the

26  existence of Cray's equipment giveaway policy is based on statements by CW3 that do not

    meet the PSLRA requirements, as discussed in section A.1 above.  CW3 does not state how

1   he became aware of the equipment giveaway policy, when or how frequently the giveaways

2   occurred, the value of the equipment, or who knew about the giveaway policy and when.

3   Finally, also as discussed in section A.1, CW1's allegations do not meet the PSLRA

4   requirements because she does not provide the basis for her knowledge, the extent of her

5   information, or what specific information was presented to Poteracki.[7]

6                           ii.      Defendants stock sales during the Class Period

7        To establish scienter, Plaintiffs rely heavily on stock sales by Defendants Johnson,

8   Kiefer, Poteracki, and Rottsolk during the Class Period.  See Pls.' Opp., at 19-21; see also

9   Compl. ¶¶ 12-15, 151-154.  In the Ninth Circuit, insider trading may be circumstantial

10  evidence that a statement was false when made and that a defendant knew of the falsity.

11  Ronconi v. Larkin, 253 F.3d at 435-36; America West, 320 F.3d at 938.  To provide any

12  basis for adequately pleading scienter, plaintiffs must allege that the stock sales are

13  "suspicious" or "unusual."  Ronconi, 253 F.3d at 435.  "[I]nsider trading is suspicious only

14  when it is *dramatically* out of line with prior trading practices *at times calculated to*

15  *maximize the personal benefit from undisclosed inside information*."  In re Silicon Graphics,

16  183 F.3d at 986 (emphasis added).  In determining whether sales are suspicious or unusual,

17  courts are to consider the following: (1) the amount and percentage of shares sold by

18  insiders; (2) whether the sales were consistent with the insider's prior trading history; and (3)

19  the timing of the sales.  Id.

20       The Ninth Circuit cases addressing insider stock sales are instructive.  First, in Silicon

21  Graphics, the Court noted that the selling defendants collectively retained 90 percent of their

22  available holdings.  Id. at 987.  The Court concluded that the sales of several defendants

23  totaling 2.6, 7.7, 4.1, and 6.9 percent, respectively, were not unusual or suspicious.  Only the

24

25  ─────────────────────
26  [7] The Court also takes note that the Plaintiffs' use of the "equipment giveaway" allegations
    as evidence of scienter is briefed only in a cursory fashion and was not the subject of
    discussion at argument.  See Pls.' Opp., at 17.

sales by two officers who sold 43.6 and 75.3 percent of their respective holdings appeared to be "somewhat suspicious." Id. However, of those two, one defendant's sales were an insignificant portion of the entire amount at issue and the other defendant was legally prevented from conducting his sales before he did so. Id. at 987-88. Thus, the Silicon Graphics Court concluded that none of the stock sales gave rise to a strong inference of deliberate recklessness. Id. at 988.

In Ronconi, the Court concluded that several of the defendants stock sales were suspicious in amount but not in timing. 253 F.3d at 435. Seven insiders sold 69 percent or more of their total stock during the class period. Id. The defendants did so when the share price was between $52.88 and $56.25, but the share price rose to a class period high of $73.00 after they sold their stock. Id. The Ronconi Court concluded that when "the insiders miss the boat [that] dramatically, their sales do not support an inference that they [were] preying on ribbon clerks who do not know what the insiders know." Id. The Court concluded that the only sales that supported "a weak inference" of scienter were those of defendant DeBuono, who sold 98 percent of her shares at prices ranging from $57 to $64. Id. at 436-37.

In America West, the Court found the defendants' stock sales suspicious and unusual where the nine defendants sold between 88 and 100 percent of their shares for proceeds of over $12 million. 320 F.3d at 939. While the America West Court noted that these large numbers and percentages did not necessarily create a strong inference of fraud, the Court found them "troubling." Id. The Court also noted that all of the sales occurred over a three-month period while the defendants were making optimistic statements regarding the company's financial outlook and falsely assuring analysts that a $5 million legal settlement with the FAA would have no economic effect on the company. Id. Finally, the Court took note that none of the defendants sold any stock in the 20 months before the class period or the four months after the class period. Id. at 939-40. The America West Court relied on all

ORDER   -26-

1    of these aspects of the sales in concluding that they gave rise to a strong inference of scienter.

2    Id. at 940.

3         Additionally, Plaintiffs rely on two District Court cases where the defendants' sales

4    gave rise to a strong inference of scienter.  See Secure Computing, 184 F. Supp. 2d at 989;

5    SeeBeyond, 266 F. Supp. 2d at 1168.  In Secure Computing, the Court relied on the

6    following facts: (1) defendants sold between 83 and 100 percent of their holdings over a

7    four-and-a-half month class period; (2) the total proceeds were $5 million; (3) none of the

8    defendants had ever sold stock before; and (4) the sales were made immediately after two

9    defendants told analysts that Secure Computing was on track to meet its financial goals and

10   immediately before the company released adverse financial information that caused the stock

11   price to decline.  184 F. Supp. 2d at 989-90.  In SeeBeyond, one defendant, Demetriades,

12   sold $18 million in stock timed to coincide with the company's announcement of its first ever

13   profit, which was allegedly the result of false or misleading financial reports.  266 F. Supp.

14   2d at 1168.  The SeeBeyond Court acknowledged that while the percentage of holdings sold

15   was relatively small (7.6 percent), the income generated was "significant."  Id. at 1169.

16   Moreover, the Court did not rely solely on the stock sales as evidence of scienter, noting that

17   two defendants "admittedly lied to analysts and investors" during the class period.  Id.  Given

18   these admissions and their importance to the scienter analysis, the relative weight of

19   Demetriades' stock sale is not clear in SeeBeyond.

20        In this case, Rottsolk, Johnson, Kiefer, and Poteracki sold 4.01, 7.06, 14.4, and 25.05

21   percent of their holdings, respectively.[8]  The sales were conducted during a five-month

22   period between August 14, 2003, and January 12, 2004.  Compl. ¶ 152.  During that period,

23   Cray stock traded at prices between approximately $8.47 and $13.49 per share.  Id.;

24   _____

25   [8] As counsel conceded at argument, Rottsolk's sale of 100,000 shares at $5.38 per share in
     February 2003 is not helpful in the scienter analysis because of the price and timing of the
26   sale.  Accordingly, the Court considers only Rottsolk's sales between August 2003 and
     January 2004.

1   Rosenbaum Decl., Ex. KK, at 349-51.  Collectively, the value of Defendants' sales was $2.9

2   million.  Id. at 152.  Prior to the sales that began in August 2003, no Defendant other than

3   Rottsolk sold stock in the preceding 33 months.[9]  Id. at 153.  The Defendants also purchased

4   shares in the open market in July 2004 and March 2005.  Rosenbaum Decl., Ex. JJ.

5                                          (a)       Amount and percentage of shares sold

6             Under the factors discussed in Silicon Graphics, the Court first concludes that these

7   sales are not rendered suspicious based on the amount and percentages of the sales.  183 F.3d

8   at 986.  In these cases (other than SeeBeyond) the Courts either held that sales equivalent to

9   those at issue here were not suspicious or that sales far more significant than those here were

10  suspicious.  See Silicon Graphics (2.6 to 7.7 percent not suspicious); Ronconi (69 percent

11  somewhat suspicious); America West (sales of 88-100 percent were "troubling"); Secure

12  Computing (83-100 percent was a factor in finding sales suspicious).  In contrast, SeeBeyond

13  was unique in that it involved an extremely large amount ($18 million), even though the sale

14  represented only 7.6 percent of Demetriades' holdings.  266 F. Supp. 2d at 1169.  SeeBeyond

15  is also distinguishable because that Court relied heavily on the fact that the defendants

16  admittedly lied to analysts and investors during the class period.  Both the percentage of

17  shares sold and the collective value of the sales indicate that the Defendants' stock sales

18  provide no evidence of scienter.

19  ///

20  ///

21

22

23  [9] Defendants also note that all of the stock sales by three of the Defendants, Rottsolk,

24  Johnson, and Kiefer (totaling two-thirds of all sales), were made pursuant to 10b5-1 plans,
    which removed control of the sales from those Defendants and placed it in the hands of a

25  broker.  The use of 10b5-1 plans is an affirmative defense, which Plaintiffs note is not
    appropriately before the Court on a motion to dismiss.  However, the use of the plans may

26  raise an inference in Defendants' favor that the sales may not be suspicious.  Wietschner v.
    Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003).

1

(b)     Consistency with prior trading history

2      The Defendants' sales are somewhat unusual because they are not consistent with

3 their prior trading history.  Only one Defendant, Rottsolk, conducted a stock sale between

4 January 2000 and August 2003 that is not alleged to be suspicious.  To the extent the

5 Defendants have no significant trading history before the sales of August 2003 to January

6 2004, the allegation that the sales "exceeded their sales in prior periods" weighs in favor of

7 concluding that the sales are evidence of scienter.[10]

8

(c)     Timing of the sales

9      On their face, the timing of the sales appears somewhat suspicious due to the price

10 range of Cray's stock.  As the <u>Ronconi</u> Court reasoned, stock sales do not support an

11 inference of scienter when they are made when the stock is trading at or near the same levels

12 it trades at after the alleged fraud is revealed.  253 F.3d at 435.  Here, Cray's stock traded at,

13 and remained near to, its Class Period (and historic) highs for the duration of Defendants'

14 sales.  This fact alone is not enough to provide a strong inference of scienter.  The cases

15 indicate that Plaintiffs must also allege that the sales exhibit some temporal connection to the

16 allegedly false or misleading statements to provide any inference of scienter.  <u>See</u> <u>e.g.</u>,

17 <u>America West</u>, 320 F.3d at 939 (sales made while defendants falsely assured analysts that a

18 legal settlement would have no economic effect); <u>Secure Computing</u>, 184 F. Supp. 2d at 989-

19 90 (sales made immediately before release of adverse financial information).  As Plaintiffs

20 conceded at argument, the Defendants' stock sales provide no evidence of scienter with

21 regard to allegedly false statements that were made after the stock sales ended.  The same

22

23

24

[10] The Court notes that the Complaint does not specifically allege that the Defendants' sales

25 are "suspicious" or "unusual."  The Ninth Circuit has required plaintiffs to plead such facts
when relying on insider sales allegations to establish scienter.  <u>See</u> <u>Ronconi</u>, 253 F.3d at 435

26 (cases "require a plaintiff to allege 'unusual' or 'suspicious' stock sales").  However, it
would be both overly formalistic and inefficient to deem these terms indispensable.

1    must hold also true for allegedly false statements that were made so far before the sales

2    began that they could not have had any reasonable connection to the increased stock price.

3           The timing of the statements related to the 2004 earnings guidance that Plaintiffs

4    allege were false or misleading does not indicate that the stock sales give rise to a strong

5    inference of scienter.  Plaintiffs rely on: (1) the July 31, 2003, statement by Rottsolk that he

6    was "very optimistic about 2004" and was "expecting the first quarter of 2004 to be good";

7    (2) the October 30, 2003, statement by Poteracki that he was "[c]onfident about [Cray's]

8    prospects for growth" in future periods; and (3) Ungaro's December 10, 2003, statement that

9    the supercomputer industry had 15-20 requests for proposals currently active, which could

10   double over the next three months.  Compl. ¶¶ 74, 80, 82.  As discussed above, the Court

11   concludes that these statements are either immaterial puffery or within the PSLRA safe-

12   harbor for forward looking statements.  Plaintiffs also rely on statements made in March,

13   April, and July 2003 and late-January 2004.  Id. ¶¶ 61, 74, 85, 87.  However, these

14   statements were either made several months before, or weeks after, the Defendants' stock

15   sales.  Thus, they do not aid in the scienter analysis.  Accordingly, the stock sales are

16   irrelevant to the scienter element of the 2004 earnings guidance claim.

17                              iii.     Cray's purchase of OctigaBay

18          Finally, Plaintiffs suggest that Defendants' scienter concerning 2004 earnings is

19   demonstrated by their motive to artificially inflate Cray's stock in order to use that stock to

20   purchase OctigaBay.  Pls.' Opp., at 22.  This argument is not developed and not supported by

21   the single case cited by Plaintiffs.  See Daou II, 411 F.3d at 1023-24 (plaintiffs alleged that

22   Defendants saved nearly 20 million shares while purchasing 11 companies with inflated

23   stock during the class period was some evidence of scienter).  There are no witnesses or

24   circumstantial evidence alleged by Plaintiffs' that Defendants intended to inflate Cray's stock

25   for the purpose of purchasing OctigaBay and, thus, no evidence of scienter.

26

ORDER   -30-

1        iv.     Scienter allegations are insufficient

2        In addition to failing to show that the 2004 earnings guidance statements were false or

3 misleading, Plaintiffs also fail to adequately allege those statements were made with scienter.

4 Under the PSLRA, Plaintiffs bear the burden of pleading a strong inference that the

5 statements were consciously false or misleading or made with deliberate recklessness.

6 America West, 320 F.3d at 931.  Mere motive and opportunity are not enough.  Silicon

7 Graphics, 183 F.3d at 979.  Even taken as a whole, the decreased X1 order backlog, use of

8 the deferred tax asset, equipment giveaways, statements by CW1, CW2, and CW3, and the

9 Defendants' stock sales provide little or no evidence of scienter as to the 2004 earnings

10 guidance statements.  Thus, the Defendants' motion to dismiss is GRANTED as to the 2004

11 earnings guidance statements for failure to comply with the PSLRA pleading requirements.

12            2.    Prospects and Profitability of Red Storm

13                a.    False or Misleading

14        Plaintiffs allege that Defendants made several false or misleading statements

15 concerning the prospects and profitability of the Red Storm project and the commercialized

16 version of Red Storm, known as the XT3.  Pls.' Opp., at 9-11, 22-26; Compl. ¶¶ 70-104.  The

17 allegedly false or misleading statements regarding Red Storm were issued as follows:

18 Rottsolk at April 30, 2003, conference call: The Red Storm project was "on
target for delivery in 2004 and moving forward quite smoothly" and Cray had
19 "achieved all the important milestones along the way."  Compl. ¶ 70.

20 Individual Defendants at October 30, 2003, conference call: Defendants
expected to recognize $45 million in revenue from the Red Storm project in
21 2004 and expected that the "final acceptance milestone" for the project "should
occur in the fourth quarter" of 2004.  Id. ¶ 80.
22
23 Ungaro at December 10, 2003, Analyst Day: The commercial version of Red
Storm, the XT3, "would reach the market in 2004 and more than double the
market for Cray's products by 2005."  Id. ¶ 82.
24
25 Poteracki at January 29, 2004, conference call: Red Storm would "figure
prominently in 2004 revenues contributing $45 million, with the bulk of these
revenues coming in the third quarter."  Id. ¶ 86.
26

Rottsolk at January 29, 2004, conference call: "The Red Storm product continues to move forward steadily" and Cray "expected to have complete systems in test shortly after the scheduled mid-February receipt of network parts."  Also, there was "tremendous market interest" in the XT3 based on Red Storm.  Id.

Rottsolk in November 4, 2004, press release over Business Wire: "We are particularly excited about delivering the first quarter of Sandia's Red Storm system and announcing general availability of both the Cray XT3(TM) and Cray XT1(TM) systems.  With these two new products, we have considerably expanded our addressable market and overall market opportunity – we have already announced a number of important wins around the world."  Id. ¶ 100.

Rottsolk in November 29, 2004, conference call: Cray took a $5.3 million charge as to Red Storm because "costs [were] somewhat higher than initially estimated" but the project had created a tremendous opportunity for the Company, i.e., the Cray XT3, the commercialized version of Red Storm had several orders.  Cray anticipated shipping all of the hardware for the Red Storm system in the fourth quarter and Rottsolk indicated that no significant amount of revenue expected for Red Storm in the fourth quarter would be delayed.  Nevertheless, Rottsolk stated that "Red Storm would be a breakeven contract."  Id. ¶ 104.

Plaintiffs maintain that these statements were false or misleading at the time they were made based on (1) the many statements by CWs that Cray was having software development problems with Red Storm throughout the project, and (2) the statement in Cray's second quarter 2005 10-Q that Cray had concluded in the third quarter of 2004 that Red Storm would be a loss contract.  Id. ¶ 109(b).

As with the 2004 earnings guidance statements, Defendants contend that the Red Storm statements are not false or misleading because they were either (1) immaterial puffery, (2) publicly known, or (3) within the PSLRA safe harbor for forward-looking statements.  First, Defendants are correct that statements suggesting the project was "moving forward quite smoothly," would "figure prominently" in 2004 revenues, "continue[d] to move steadily forward," and that there was "tremendous market interest" in the XT3, are vague, non-actionable puffery.  Second, Defendants note that they disclosed the delays in Red Storm for the first time on July 26, 2004, in a press release and conference call.  Rosenbaum Decl., Exs. Q ("[W]hile production of the Red Storm system has begun . . . delays in parts shipments will impact the number of systems that can be delivered to other customers this

1    year."), and FF (a few bumps along the way have pushed out product launch dates . . . expect
2    to begin shipping the Sandia Red Storm system in [the third quarter 2004]).

3         Finally, Defendants are correct that many of the statements are forward looking.  See
4    Compl. ¶ 70 (on target for delivery in 2004), ¶ 80 (expect to recognize $45 million in revenue
5    in 2004 and final acceptance should occur in fourth quarter 2004), ¶ 82 (XT3 would reach
6    market in 2004 and double market in 2005), ¶ 86 (project will figure prominently in 2004
7    revenues), ¶ 104 (anticipated shipping all the hardware in fourth quarter 2004).  Defendants
8    note that Cray consistently issued warnings in its Forms 10-K and 10-Q filings that Cray
9    "may not be successful in completing the Red Storm project on time and on budget, which
10   would adversely affect our earnings." Rosenbaum Decl., docket no. 52, Ex C. at 65 (March
11   28, 2003, 10-K); See id. Exs. D-J (quarterly Forms 10-K and 10-Q).  The Forms 10-K and
12   10-Q noted Red Storm's tight development schedule, reliance on third-party suppliers, and
13   reliance on continued government funding.  Id.  Defendants also refer to cautionary warnings
14   provided at the opening of its conference calls with investment analysts.  Id. Exs. W-GG.
15   These warnings indicate that future events and projections may be different than actual
16   results and refer the participants to the "Risk Factor" sections of Cray's SEC filings.  Id.
17   More specifically, there were several Red Storm related cautionary statements made by the
18   Defendants during conference calls.  Id. Exs. BB, DD, and FF.

19        Under the safe harbor provided in 15 U.S.C. § 78u-5(c)(1)(A)(i), a claim based on the
20   Red Storm statements is foreclosed with one exception: the only portion of the allegations
21   that Defendants fail to address are Rottsolk's statements on November 4, 2004, and
22   November 29, 2004, that Red Storm would be a break-even contract.  On November 4, 2004,
23   Rottsolk stated in a conference call that, for Red Storm, "[w]e've now increased our cost
24   estimate and that effectively takes the profit margin down to zero."  Rosenbaum Decl., Ex.
25   GG at 289.  And on November 29, 2004, he stated that Red Storm would be a break-even
26   contract.  Compl. ¶ 104.  Plaintiffs allege that this was "patently false" because, as allegedly

1  stated in their Form 10-Q for second quarter 2005, "the Company" was aware as of the third

2  quarter for 2004 (i.e., before the statements were made) that Red Storm would be a loss.[11] Id.

3  at ¶ 109(b).  Defendants do not dispute this allegation of falsity in their briefing.

4                    b.      Scienter as to Red Storm Allegations

5          Plaintiffs argue that there are "numerous facts" that give rise to a strong inference that

6  Defendants knew or recklessly disregarded the fact that their statements concerning Red

7  Storm were materially false and misleading.  Pls.' Opp., at 22.  First, Plaintiffs rely once

8  again on the insider trading allegations.  However, the timing of the Red Storm statements

9  does not indicate that the stock sales give rise to a strong inference of scienter.  Plaintiffs rely

10  on two statements made in close proximity to the stock sales: (1) Defendants' statements

11  during an October 30, 2003, conference call that they expected Cray to recognize $45 million

12  in revenue from Red Storm in 2004 and that the "final acceptance milestone" for the project

13  "should occur in the fourth quarter" of 2004; and (2) Ungaro's statement on December 10,

14  2003, that the commercial version of Red Storm (the XT3) would "reach market in 2004 and

15  more than double the market for Cray's products by 2005."  Compl. ¶¶ 80, 82.  While the

16  sales might provide some evidence of scienter as to these statements, both the October 30 and

17  December 10 statements are forward looking, referring to "expectations" and a belief that the

18  _____

19  [11] It does not appear from the record that either party has provided a copy of the second
    quarter 2005 10-Q, which allegedly reveals that "Cray concluded Red Storm would be a loss

20  contract" in the third quarter 2004.  See Compl. ¶ 109(b).  However, the Court's review of
    the SEC filings reveals that the Form 10-Q for the second quarter 2005 states as follows: "In

21  the third quarter of 2004, the Company concluded [Red Storm] would be a loss contract.  As
    of June 30, 2005, the estimated cumulative loss was $15.5 million.  As of December 31,

22  2004, the estimated cumulative loss was $7.6 million."  Cray Incorporated Form 10-Q,
    available at http://www.sec.gov/Archives/edgar/data/949158/000095012405004820/v11356

23  e10vq.htm#tocpage.  See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) ("documents
    whose contents are alleged in a complaint and whose authenticity no party questions, but

24  which are not physically attached to the pleading, may be considered in ruling on a Rule

25  12(b)(6) motion to dismiss"), overruled on other grounds by Galbraith v. County of Santa
    Clara, 307 F.3d 1119, 1127 (9th Cir. 2002); Silicon Graphics, 183 F.3d at 986 (under Branch,

26  courts may consider SEC filings that are incorporated by reference in the complaint).

ORDER   -34-

XT3 "would reach the market in 2004."  The PSLRA safe harbor provision renders these statements in-actionable.  Moreover, the other allegedly false or misleading Red Storm statements were made well before Defendants began selling stock (April 2003) or in 2004, after the stock sales ended.  Id. ¶¶ 70, 86, 100, 104.  The stock sales simply provide no evidence of scienter as to such statements.

In addition to relying on the insider trading allegations, Plaintiffs contend that multiple CWs' statements suggesting that Red Storm had development problems establish the scienter element.  As discussed above, only the statements by CW4, CW5, and CW6 have any reliability with regard to the development problems with Red Storm, and only CW4 and CW6 appear to have worked on Red Storm as Cray employees at any time.[12]

Defendants argue that the CWs' statements have no connection to the scienter element because: (1) the CWs' statements about delays are vague in that they do not specify the extent of the development problems, the timing of any specific problem, or how such problems affected the product; (2) none of the CWs claim to have reported their "information" about software problems to any of the Defendants; and (3) there are no corroborating documents by any of the CWs.  Defendants are correct, particularly with regard to timing and the failure to demonstrate that any of the Defendants knew of the CWs' information.  Timing is critical because Defendants publicly disclosed the Red Storm delays in July 2004, meaning there could be no "intent to deceive" by hiding delays after that date. See, e.g., Compl. ¶ 46 (CW5 reports lack of workable software as of *fall 2004*, when equipment was shipped to Sandia, which was *after* Defendants first disclosed Red Storm production problems).  Additionally, none of the CWs claim to have reported directly to any of the Defendants, nor do they provide any basis to conclude that the information was reported to the Defendants.  To the extent the statements of these CWs are hearsay, they cannot support any inference of scienter, much less a strong inference.  Simply put, the CWs

---

[12] See supra, note 6.

relied upon by Plaintiffs do not support a strong inference that any or all of the Defendants had actual knowledge contradicting any of their allegedly false statements on any given date.

As for the statements that Defendants do not dispute were false (Rottsolk's "break-even contract" comments), the allegations in the Complaint are unclear. Plaintiffs simply allege that the statement was false because the second quarter 2005 10-Q stated: "In the third quarter 2004, Cray concluded [Red Storm] would be a loss contract." Compl. ¶ 109(b). This acknowledgment does not indicate which Defendants, if any, within "Cray" concluded that Red Storm would be a loss contract or the degree to which they expected it to be a loss. The second quarter 2005 10-Q states only that as of December 31, 2004, Cray expected it to be a loss of $7.6 million. Thus, the allegations of scienter as to the November 2004 statements are insufficient to create a "strong inference" that Rottsolk was acting with the intent to deceive or with deliberate recklessness. Plaintiffs' scienter allegations regarding the Red Storm project are insufficient to survive Defendants' motion to dismiss.

### 3. SEC Filings and Financial Statements

#### a. False or Misleading

Plaintiffs allege that Defendants misled investors in their SEC filings in two respects. First, Plaintiffs allege that it was misleading to record a $42 million deferred tax asset at the end of 2003 and continue to record that asset in the first and second quarters of 2004. Compl. ¶¶ 123-130. Second, Plaintiffs allege that it was misleading to omit the use of equipment giveaways from the MD&A section of Cray's Forms 10-K and 10-Q. Id. ¶ 40-42. Defendants move to dismiss as to these allegations because (1) the use of the deferred tax asset was disclosed as was its subsequent valuation adjustment, and (2) the allegations by CW3 concerning the equipment giveaways is vague and not based on personal knowledge, so there is a basis to conclude such giveaways should have been included in the MD&A sections.

i.    Deferred tax asset

A "deferred tax asset" is a tax loss carryforward that allows a corporation to record taxable losses from one year in future years.  Plaintiffs allege that Cray had a deferred tax asset available for use that was valued at approximately $58.6 million as of the year end 2003.  Compl. ¶ 130.  Plaintiffs further allege that Cray improperly recorded this asset at the close of 2003, having the effect of overstating net income by approximately $42 million.  Id. Plaintiffs' allege that, if proper accounting standards were followed, the deferred tax asset should have been reduced by what is known as a "valuation allowance."  Id. ¶¶ 123-131.  A valuation allowance is an accounting event that reduces the portion of the asset to be used. Finally, Plaintiffs allege that the improper recording of the asset had a "signaling" effect on the investment community, indicating that Defendants believed Cray would be more profitable than the evidence suggested and, thereby, mislead investors.  Id. ¶ 43.

The accounting standards for recognizing a deferred tax asset are established in SFAS No. 109.  Stated plainly, a company may record a deferred tax asset without a valuation allowance if it is more likely than not that the entire asset will be realized, i.e., that the company will be sufficiently profitable to make full use of the past losses.  Compl. ¶ 124 (citing SFAS No. 109 ¶ 17).  This is a judgment call based on all available positive and negative evidence, including historical information and currently available information regarding future years.  Id. (citing SFAS No. 109 ¶ 20).  When there is negative evidence, such as cumulative losses in recent years, a history of operating losses and the existence of unsettled circumstances, it is difficult to conclude that the asset should not be reduced by a valuation allowance.  Id. ¶ 125 (citing SFAS No. 109 ¶ 23).

Plaintiffs contend that, based on the evidence existing at the time, Defendants could not have concluded that Cray would be able to make use of the entire deferred tax asset and, therefore, recording the asset misled investors by signaling that Cray would be more profitable than it could have been under the circumstances.  Id. ¶ 127.  Plaintiffs rely on the

1    following facts: (1) Cray had incurred net losses of $35.2 million in 2001, $25.4 million in

2    2000, and $34.5 million in 1999; (2) Cray's net income of $5.4 million in 2002 and $63.2

3    million in 2003 was not a basis to conclude future profitability would be sufficient because of

4    slowing orders for the X1 and production problems with Red Storm; and (3) Cray faced

5    "increasingly challenging customer acceptance tests."  Id. ¶ 128.  Also, because the asset was

6    recorded at the end of 2003, part of the $63.2 million net income from that year was the

7    result of recording the asset as opposed to revenue from operations.

8         Plaintiffs cite no cases in which courts have concluded that the use of a deferred tax

9    asset was misleading but instead rely on the general principal that financial statements not in

10   accordance with GAAP are "presumed to be misleading or incorrect,"  17 C.F.R. § 210.4-

11   01(a)(1), and may provide evidence of scienter.  See Daou II, 411 F.3d at 1018 (plaintiffs'

12   allegation that defendants systematically reported revenue before it was earned in violation

13   of GAAP along with "myriad observations of accounting misfeasance" was sufficient to

14   show revenue was misleading); Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996)

15   (GAAP violations *along with* evidence that defendants violated their own accounting policies

16   was sufficient evidence to overcome summary judgment); In re Cirrus Logic Sec. Litig., 946

17   F. Supp. 1446, 1459 n.10 (N.D. Cal. 1996) (same, citing Provenz).

18        Defendants deem Plaintiffs' allegations as to the tax deferred asset a "Red Herring" in

19   that the information concerning Cray's past profits and losses were readily available to the

20   market.  Defendants' argument has merit.  First, Defendants point out that the booking of the

21   asset was approved by Cray's auditors and that all stock sales occurred *before* Defendants

22   recognized the asset on January 29, 2004.  Second, Defendants correctly note that the

23   judgment call required under SFAS 109 was made based on recent profitability and that Cray

24   promptly reversed course and disclosed the change to investors when Defendants realized

25   that the asset could not be fully utilized in November 2004.  Additionally, there is no

26   "systematic" over-reporting of revenue as in Daou II and, unlike Provenz, there appears to be

1    no allegation that Cray violated its own policies if in fact Defendants made an incorrect

2    judgment call in recording the asset.  See also Daou II, 411 F.3d at 1017 (allegations must be

3    sufficient for court to "discern whether the alleged GAAP violations were minor or technical

4    in nature, or whether they constituted *widespread and significant inflation of revenue*")

5    (emphasis added).  Based on these considerations, the Court concludes that publicly

6    recording the asset on January 29, 2004, and reducing it in November 2004 was not

7    materially misleading.

8                              ii.    Equipment giveaways

9          Next, Plaintiffs allege that it was misleading for Defendants to have engaged in

10   equipment giveaways as incentives to customers who accelerated acceptance of Cray's

11   products and, thereby, generated revenue more quickly.  Compl. ¶ 40-42.  Under Item 303 of

12   Regulation S-K, a company must "[d]escribe any known trends or uncertainties that have had

13   or that the registrant reasonably expects will have a material favorable or unfavorable impact

14   on net sales or revenues or income from continuing operations."  17 C.F.R. §

15   229.303(a)(3)(ii).  Plaintiffs allege that Defendants violated this requirement by failing to

16   disclose the giveaways in the MD&A section of Cray's Forms 10-K and 10-Q, which misled

17   investors.  Compl. ¶ 42.  Plaintiffs do not provide any specific dates on which these

18   giveaways are alleged to have occurred and do not allege that any specific 10-K or 10-Q is

19   false or misleading.

20         Plaintiffs' allegations are insufficient.  The only basis for the giveaway allegations is

21   the statement by CW3 that Cray would "give away equipment or another cabinet of

22   processors 'to get acceptance to happen' in situations where customer acceptance dragged

23   out."  Id. ¶ 41.  As discussed in section A.1 above, this statement by CW3 is vague and not

24   sufficiently based on personal knowledge to satisfy the PSLRA requirements.  See also

25   Metawave, 298 F. Supp. 2d at 1080 (revenue recognition irregularity allegations should

26   include (1) approximate amount of overstatement; (2) products involved; (3) dates of any

1    transactions; and (4) identities of any customers or employees involved).

2                            b.      Scienter

3          Even assuming that Plaintiffs' allegations were sufficient to show that recording the

4    deferred tax asset or omitting the use of customer giveaways was misleading, they fail to

5    adequately plead that Defendants knew they were misleading or were deliberately reckless in

6    their actions.  Plaintiffs again rely on the stock sales, contending that the sales create an

7    inference of scienter as to the allegedly false or misleading use of the deferred tax asset and

8    equipment giveaways.  At argument, the parties agreed that the use of the deferred tax asset

9    was first disclosed to the public on January 29, 2004, when Cray released its fourth quarter

10   2003 financial information to the public.  Thus, the stock sales provide no evidence of

11   scienter as to the use of the deferred tax asset because the stock sales were complete as of

12   January 12, 2004.  Additionally, the timing of the equipment giveaways, and the connection

13   of those giveaways to any specific financial statement issued by Cray, has not been

14   adequately pled.  The allegations of CW3 regarding the giveaways are vague and insufficient

15   to establish a securities fraud claim.

16         In addition to their other general allegations of scienter (motive to inflate Cray's stock

17   price, false assurances regarding Cray's internal controls, allegedly false comments about

18   Red Storm), Plaintiffs primarily rely on CW2, who states that talk that Cray was "fudging its

19   books" spread like wildfire through the Chippewa Falls community.  As discussed in section

20   A.1 above, this allegation is wholly insufficient under the PSLRA standard because CW2

21   would not be able to give such hearsay testimony at trial.  Accordingly, Plaintiffs fall far

22   short of establishing a strong inference that Defendants knowingly, or with deliberate

23   recklessness, issued misleading financial statements.

24   ///

25   ///

26   ///

ORDER   -40-

1          4.      Internal Controls and Section 302 Certifications

2              a.      False or Misleading

3          Plaintiffs allege that the Defendants made false or misleading statements concerning

4   Cray's "internal controls" based on the interplay between two sections of the SOX.  The

5   SOX 302 was implemented in August 2002 and requires the CEO and CFO to publicly

6   certify the "effectiveness of the registrant's *disclosure controls and procedures*" and any

7   "significant changes in the registrant's internal controls" in periodic reports filed with SEC.

8   67 Fed. Reg. 57,276, 57,287 (Sept. 9, 2002) (emphasis added).  The SOX 302 "disclosure

9   controls and procedures" are "controls and other procedures of an issuer that are designed to

10  ensure that information required to be disclosed by the issuer in the reports that it files or

11  submits under the Exchange Act . . . [are] recorded, processed, summarized and reported,

12  within the time periods specified in the Commission's rules and forms." Id. at 57,277-78.

13  Under SOX 404, the SEC required companies such as Cray to file an assessment of the

14  company's internal controls over financial reporting by the end of the fiscal year ending after

15  November 15, 2004.  Cray filed its final SOX 404 assessment in the amended 10-K of

16  May 3, 2005.

17         Plaintiffs allege that the certifications signed by Rottsolk and Poteracki under SOX

18  302 were false or misleading because Cray did not have adequate internal controls.  The

19  Forms 10-Q and SOX 302 certifications stated as follows:

20         [W]e evaluated the effectiveness of the design and operation of our ***disclosure
           controls and procedures***.  Our principal executive and financial officers
21         supervised and participated in this evaluation.  Based upon this evaluation ***our
           principal executive and financial officers each concluded that our disclosure
22         controls and procedures are effective in timely alerting them to material
           information required to be included in our periodic SEC reports***.
23
           . . .
24
           4.  The registrants' other certifying officers and I are responsible for
25         establishing and maintaining disclosure controls and procedures (as defined in
           Exchange Act Rules 13a-14 and 15d014) for the registrant and we have:
26

a. designed such ***disclosure controls and procedures*** to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities . . . .

b. evaluated the effectiveness of the registrant's ***disclosure controls and procedures*** as of a date within 90 days prior to the filing date of this quarterly report.

Compl. ¶¶ 52-53 (third quarter 2002) (emphasis added).  See also id. ¶¶ 64-65, 71, 75, 81, 90, 93, 97, 107 (citing substantially similar 10-Q forms and certifications for fourth quarter 2002 through third quarter 2004).

Plaintiffs allege that the Forms 10-Q and SOX 302 certifications were rendered demonstrably false by the May 3, 2005, Form 10-K/A that revealed the results of Cray's SOX 404 analysis.  The 10-K/A stated as follows:

Based on the [SOX 404] evaluation, our principal executive and financial officers each concluded that, as of the end of the period covered by this report, [December 31, 2004], due to the material weaknesses in our internal control over financial reporting described below, ***our disclosure controls and procedures were not effective in providing reasonable assurance that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's form and rules***.

Id. ¶ 117.  Plaintiffs do not allege that any specific SEC filings actually reported incorrect results as a result of these "material weaknesses" but only that this SOX 404 disclosure establishes that the weaknesses existed, rendering the earlier SOX 302 certifications false or misleading.

In moving to dismiss, Defendants initially argued that Plaintiffs' SOX 302 allegations failed because: (1) the SOX 302 certifications were distinct from the material weakness identified in the SOX 404 review that was ultimately released in May 2005, meaning the SOX 302 certifications were not false; and (2) the scienter allegations based on the CW's statements and stock sales were entirely deficient.  Defs.' Mot., at 15-22.  With regard to falsity, Defendants argued that the SOX 302 certifications "covered *only* the requirement to disclose in [the 10-K and 10-Q] any material changes in internal controls that had occurred in the most recent quarter."  Id. at 16 (emphasis added).  This assertion is incorrect.  As is

ORDER   -42-

1   apparent from the Form 10-Q and SOX 302 certification quoted above, the statements made

2   by Defendants went beyond merely disclosing "material changes" from quarter to quarter.

3   Moreover, in opposition, Plaintiffs correctly note that the SOX 404 report disclosed in the

4   May 2005 10-K/A specifically refers to the "disclosure controls and procedures" mentioned

5   in the SOX 302 certifications.  Notably, Defendants offered no further support for their

6   argument that the Forms 10-Q and SOX 302 certifications were not false in the reply brief.

7   See Reply, at 14-15 (relying only on the argument that Plaintiffs did not adequately plead

8   scienter).  The Court concludes that the Complaint adequately alleges that the 10-Q and SOX

9   302 certifications for third quarter 2002 through third quarter 2004 were false or misleading

10  based on the disclosure in 2005 that there were material weaknesses in Cray's internal

11  controls and procedures.

12                                b.      Scienter

13          While Plaintiffs are correct that the Complaint adequately alleges that the Forms 10-Q

14  and SOX 302 certifications were false or misleading, they fail to adequately plead scienter.

15  Plaintiffs must allege not only that the Forms 10-Q and SOX 302 certifications were false or

16  misleading, but also that Defendants had actual knowledge of their false or misleading nature

17  or were deliberately reckless in issuing such statements at the time.  In this the Complaint

18  falls short.

19          Plaintiffs first argue that the stock sales create an inference of scienter as to the SOX

20  302 certifications filed along with Cray's Forms 10-Q.  Defendants Rottsolk and Poteracki

21  signed materially identical SOX 302 certifications on nine separate occasions between third

22  quarter 2002 and third quarter 2004.  Three of those certifications were signed several

23  months before the stock sales began (November 14, 2002, March 28 and May 15, 2003).

24  Compl. ¶¶ 52-53, 65, 71.  Two of the certifications were signed contemporaneously with the

25  period of stock sales (August 14 and November 14, 2003).  Id. ¶¶ 75, 81.  The final four

26  certifications were signed after the stock sales ended (March 12, May 10, August 9, and

November 9, 2004).  Id. ¶¶ 90, 93, 97, 107.  Once again, the stock sales cannot support an inference of scienter as to certifications signed well before the stock sales began and after they ended.  Thus, the only issue is the degree to which the stock sales support an inference of scienter as to the certifications made in August and November 2003.

In concluding that stock sales provided evidence of scienter, the America West and Secure Computing Courts relied on allegations that the defendants were falsely assuring the public of their companies' positive financial situation while simultaneously selling stock.  Although Plaintiffs make similar allegations here as to the quality of Cray's system of internal controls, the inference of scienter is diminished because the certifications began nearly a year before the Defendants' sales and continued for over a year after they ended.  That is to say, a five-month period of stock sales does not create a strong inference of scienter where the allegedly false statements were made in a uniform and routine manner for over two years; the connection between the statements, the increased stock price, and the sales is far too weak.  The sales are "suspicious" and "unusual" only if made "at times calculated to maximize the personal benefit from undisclosed inside information."  Silicon Graphics, 183 F.3d at 986.  Here, Plaintiffs do not adequately allege that the sales were timed to maximize the benefit from false SOX 302 certifications that were issued quarterly for at least nine quarters.

Plaintiffs also rely on CW1 and CW2 to plead Defendants' scienter as to the SOX 302 certifications.  As discussed in section A.1 above, CW1's allegations are vague, insufficiently based on personal knowledge, and fail to establish what information was passed to Defendant Poteracki or others at what time.  Similarly, Defendants are correct in categorizing CW2's hearsay allegation that there was "talk" Cray was "fudging its books" as merely "gossip and innuendo."  See Metawave, 298 F. Supp. 2d at 1068-69.  In sum, Plaintiffs provide no allegations that create a strong inference of scienter and, therefore, Defendants are entitled to dismissal as to the SOX 302 allegations.

1          **C.     Loss Causation**

2          In addition to their contention that Plaintiffs' 10(b) first claim must be dismissed for

3  failing to adequately plead falsity and scienter under the heightened PSLRA requirements,

4  Defendants also move to dismiss for failure to plead loss causation.  Specifically, Defendants

5  argue that the Complaint fails to adequately allege loss causation as to: (1) alleged false or

6  misleading SOX 302 certifications; (2) alleged use of customer giveaways to accelerate

7  acceptance under Cray's X1 contracts; and (3) alleged GAAP violations caused by the

8  inclusion of the deferred tax asset on financial statements.  Defs.' Mot., at 23, 25, and 35.

9          The PSLRA expressly imposes on Plaintiffs "the burden of proving" that the

10  Defendants' misrepresentations "caused the loss for which the plaintiff seeks to recover

11  damages." 15 U.S.C. § 78u-4(b)(4).  However, this burden is not subject to the Act's

12  heightened pleading requirements applicable to scienter.  See Dura Pharm. v. Broudo, 125 S.

13  Ct. 1627, 1634 (2005) (federal rules require only "a short and plain statement of the claim

14  showing that the pleader is entitled to relief" for economic loss causation).  Plaintiffs are

15  required to "provide defendant with fair notice of what the plaintiff[s'] claim is and the

16  grounds upon which it rests." Id. (quotation omitted).  In Dura, the Supreme Court held that

17  allegations suggesting only that plaintiffs paid an "artificially inflated purchase price" are

18  insufficient under this standard.  Id.  Rather, to plead loss causation, Plaintiffs must

19  "demonstrate a causal connection between the deceptive acts that form the basis for the claim

20  of securities fraud and the injury suffered by the Plaintiffs." Daou II, 411 F.3d at 1025.  For

21  example, if allegedly improper accounting practices did not lead to a decrease in stock price,

22  there is an insufficient link to damages.  Id. at 1026 (price need not fall *immediately* upon the

23  revelation of the fraud to prove causation but price must decline over time as the fraud came

24  out).

25  ///

26  ///

1          1.      False or Misleading SOX 302 Certifications

2          Defendants argue that there is no loss causation as to the allegedly false SOX 302

3    certifications because the revelation that those certifications were false did not alter any of

4    Cray's financial results.  Defendants also contend that the internal control weaknesses were

5    first revealed on November 9, 2004, when Defendants stated that they "may receive an

6    adverse opinion from our auditors or a disclaimer of opinion regarding whether we have any

7    significant deficiencies or material weaknesses in our internal controls over financial

8    reporting."  Rosenbaum Decl., Ex. J at 160.  Cray's stock dropped that day from $3.27 to

9    $3.25 and dropped to $3.21 the next day, but it rebounded to $3.37 within a week.

10   Defendants reason that this precludes any possibility of loss causation.

11         In response, Plaintiffs provide a confusing paragraph of argument in which they assert

12   that the truth concerning matters such as demand for the X1, Red Storm, and Cray's ability to

13   grow revenues in 2004 was "concealed by" the "undisclosed material internal control

14   weaknesses."  Pls.' Opp., at 36.  This argument has no relevance to the question of whether

15   or when Plaintiffs suffered losses as a result of the allegedly false certifications by Rottsolk

16   and Poteracki that they had designed and evaluated effective disclosure controls and

17   procedures for Cray.  Indeed, the Complaint alleges only that Cray's stock price declined

18   from $3.15 on March 15, 2005, to $2.08 on May 9, 2005, as a result of the disclosures of

19   material internal control weaknesses.  Compl. ¶ 119.  Plaintiff's loss causation allegation

20   regarding the internal control weaknesses is well-plead but must be limited to the period after

21   the alleged fraud was revealed to the public.

22         2.      Customer Giveaways

23         Defendants contend that "plaintiffs cannot plead loss causation, because the alleged

24   practice could not have affected the stock price during the Class Period, as plaintiffs allege

25   that it was never disclosed."  Defs.' Mot., at 25.  In response, Plaintiffs state that the

26   giveaways created "the false and misleading impression of greater momentum in X1 sales in

2003 than actually existed." Pls.' Opp., at 36. Plaintiffs' argument is not well-taken. The Complaint contains no allegations regarding the nature, extent, and materiality of these giveaways, the impact (if any) on Cray's stock, or when the alleged false or misleading nature of the giveaways was revealed to the market, causing a decline in stock price that harmed Plaintiffs. Plaintiffs' claims as to the giveaways are dismissed for failure to plead loss causation.

### 3.      Use of Deferred Tax Asset

Defendants argue that Plaintiffs fail to plead loss causation with respect to the deferred tax asset because, after the decision not to fully utilize the asset was publicly disclosed on November 4, 2004, Cray's stock price dropped from $3.47 to $3.18 the next day but recovered to $3.53 two days later and traded above that level for the next four months. Again, Plaintiffs argue that the "booking of the $42 million deferred tax asset" in some way "concealed the truth" about the problems with X1 demand, Red Storm, and 2004 revenue. There is no specific allegation in the Complaint that the booking of the deferred tax asset and subsequent reversal of that booking affected Cray's stock price. Plaintiffs' claims as to the deferred tax asset is dismissed for failure to plead loss causation.

### D.      Controlling Person Liability

Defendants move to dismiss Plaintiffs' Section 20(a) claim for controlling person liability because it requires Plaintiffs to demonstrate an underlying violation of the Exchange Act. See In re Nike, Inc., Sec. Litig., 181 F. Supp. 2d 1160, 1173 (D. Or. 2002) ("To be liable under § 20(a), a defendant must be liable under another section of the Securities Exchange Act of 1934."). For the reasons discussed above, the Complaint does not adequately plead a violation of Section 10(b). Therefore, Defendants are correct that a Section 20(a) claim is not available at this time. Defendants' motion to dismiss the Section 20(a) claims is GRANTED.

1    **II.    Dismissal With or Without Leave to Amend**

2        In most cases, courts should freely grant leave to amend when a viable case may be

3    presented.  FED. R. CIV. P. 15(a).  When the allegations in a securities fraud complaint are

4    inadequate to establish a strong inference of deliberate recklessness, dismissal with leave to

5    amend is the most prudent course of action, unless it is clear that the pleading could not be

6    saved by amendment.  Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052-53 (9th

7    Cir. 2003).  Plaintiffs move for leave to amend the Complaint if the Defendants' motion to

8    dismiss is granted.  Pls.' Opp., at 37.  Defendants offer no opposition.  Plaintiffs' request for

9    leave to amend is GRANTED.

10   **CONCLUSION**

11       Plaintiffs fail to adequately plead both falsity and scienter as to their allegations

12   regarding 2004 earnings guidance, Red Storm, and the allegedly false or misleading SEC

13   filings.  Additionally, while the Complaint adequately pleads falsity as to the SOX 302

14   certifications, Plaintiffs' scienter allegations regarding SOX 302 do not meet the PSLRA

15   requirements.  Accordingly, the Court GRANTS Defendants' motion to dismiss the Section

16   10(b) claims, docket no. 51, and dismisses those claims without prejudice.

17       The Court also GRANTS the Defendants' alternative motion to dismiss for failure to

18   plead loss causation under FED. R. CIV. P. 8(a) as to the deferred tax asset and customer

19   giveaways.  These claims are dismissed without prejudice.

20       Because the Section 10(b) claims must be dismissed, Defendants' motion to dismiss

21   the Section 20(a) claim for controlling person liability is GRANTED.  Id.  Plaintiffs' Section

22   20(a) claim is dismissed without prejudice.

23       The Court DENIES Plaintiffs' motion to strike Exhibit A to the Rosenbaum

24   Declaration, docket no. 53, and GRANTS Defendants' motion to strike Exhibit A to the

25   Pacharzina Declaration, docket no. 57.

26

ORDER   -48-

1    Finally, the Court GRANTS Plaintiffs' motion for leave to amend the Complaint,

2  docket no. 53.  Any amended complaint must be filed within 120 days after the entry of this

3  Order.

4

5    IT IS SO ORDERED.

6    DATED this 27th day of April, 2006.

7

8                                       s/ Thomas S. Zilly
                                        _____
9                                       THOMAS S. ZILLY
                                        United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   -49-